[Cite as *State v. Norales-Martinez*, 2018-Ohio-4356.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

| | |
|---|---|
| State of Ohio | Court of Appeals No. WD-17-041 |
| Appellee | Trial Court No. 16 CR 631 |
| v. | |
| Selin A. Norales-Martinez | **DECISION AND JUDGMENT** |
| Appellant | Decided: October 26, 2018 |

* * * * *

Paul A. Dobson, Wood County Prosecuting Attorney, and
David T. Harold, Assistant Prosecuting Attorney, for appellee.

Jeffrey P. Nunnari, for appellant.

* * * * *

**MAYLE, P.J.**

{¶ 1} Following a jury trial, defendant-appellant, Selin A. Norales-Martinez ("Norales"), appeals the July 10, 2017 judgment of the Wood County Court of Common Pleas, convicting him of one count of possession of marijuana and one count of trafficking in marijuana, and sentencing him to a mandatory prison term of eight years. For the reasons that follow, we affirm the trial court judgment.

## I. Background

{¶ 2} On the morning of December 9, 2016, Ohio State Highway Patrol Trooper, Ann Malone, and U.S. Border Patrol Agent, Nick King, were patrolling a stretch of the Ohio Turnpike in Wood County, Ohio, at the crossover at milepost 67.6. A U-Haul truck pulling a Hyundai vehicle on a trailer drove past Trooper Malone heading eastbound. Trooper Malone, a criminal interdiction officer, observed what she described as "criminal indicators" manifested by the driver and the passengers of the U-Haul: the driver was sitting in a rigid position and did not look over at her, there were three occupants squeezed into the front seat, which looked to her to be "very uncomfortable," and the U-Haul was hauling a passenger vehicle with Maryland license plates, which seemed "a little odd." She pulled behind the U-Haul to observe further behavior and to run a registration check. She learned that the Hyundai was a rental vehicle, which she described as "a huge, huge red flag."

{¶ 3} With the trooper behind her, the driver of the U-Haul—later identified as Belkis Bain-Garcia ("Bain")—eventually committed minor marked lanes violations: she twice briefly drifted over the painted white lane divider without signaling, and she switched lanes but turned off her turn signal before fully completing the lane change. She also decreased her speed "greatly" to 58 to 60 miles per hour in a 70-mile-per-hour zone and changed lanes "for no apparent reason." Trooper Malone initiated a stop of the vehicle.

2.

**{¶ 4}** Upon approaching the vehicle, Trooper Malone noticed an odor of marijuana "emitting from inside of the traffic [sic] portion of the U-Haul." She described that the U-Haul had a "lived-in" look, with trash, cups, beverages, bottles of water, and snacks in the passenger compartment. There were numerous cell phones and chargers in the vehicle, and there was an air freshener hanging from a cell phone that was mounted to the window. According to Trooper Malone, the "lived-in" look of the vehicle was significant because drug traffickers drive long distances and do not want to make stops. She said that the multiple cell phones and the air freshener are also criminal indicators.

**{¶ 5}** Trooper Malone approached the U-Haul on the passenger side. Norales was seated in the right passenger seat of the U-Haul, and Javier Ortiz-Nunez ("Ortiz") was seated in the middle. Trooper Malone testified that as she spoke to the driver through the passenger window, Norales stared straight ahead and did not make eye contact with her. She deemed this behavior to be a "huge criminal indicator" because there was "no reason for him to act that way towards" her. She observed that Ortiz had bloodshot eyes, and she rated the odor of marijuana in the cab as a six on a scale of one to ten.

**{¶ 6}** Bain presented a Maryland driver's license and rental agreements for the U-Haul and the Hyundai being towed. Trooper Malone asked her to exit the vehicle and directed her to sit in the backseat of the cruiser. Bain, a Spanish-speaker who knows some English, told Trooper Malone that she rented the Hyundai, and her cousin— Norales—rented the U-Haul. The rental agreements confirmed this. Trooper Malone

3.

asked Bain why the cab smelled of marijuana and she responded that her boyfriend—Ortiz—smokes marijuana.

{¶ 7} Trooper Malone spoke with Ortiz and he told her that he lives in Seattle and his girlfriend lives in Maryland. He said that they were moving his cousin—Norales—to Maryland. He explained that they had a company that had a new contract in Maryland. He claimed that the items in the back of the U-Haul belonged to Norales. Trooper Malone asked Ortiz if he had marijuana in the vehicle, and he responded affirmatively, commenting that it is legal in Seattle. She told him that his tongue appeared green and asked if he had been eating edible marijuana. He said that he was just tired.

{¶ 8} One by one, Trooper Malone placed all three of the U-Haul's occupants into the back of her cruiser where their conversations—conducted in Spanish—were being recorded. Their conversations would later be translated and transcribed.

{¶ 9} Trooper Malone asked for the keys to the cargo area of the U-Haul and for the Hyundai. Ortiz told her where to find them. Shortly thereafter, Trooper Alejo Romero arrived on the scene. Norales was moved into Trooper Romero's cruiser.

{¶ 10} Trooper Malone asked additional questions of Ortiz. Ortiz told her that his cousin was going to be staying in Maryland for a couple of months because he got a painting contract there. He indicated that they both had families back in Seattle and would be returning. He said that his girlfriend—Bain—came out to visit him and they drove back with her so she would not have to drive back alone. Again, he said that Norales owned the items in the U-Haul.

4.

{¶ 11} Agent King, Trooper Romero, and Trooper Malone looked inside the cargo area of the U-Haul. There were five boxes in the front. They opened one and discovered that it was full of vacuum-sealed packages of marijuana. The three occupants of the U-Haul were arrested. Trooper Romero advised them of their *Miranda* rights in Spanish.

{¶ 12} When a more extensive search of the vehicles was conducted, law enforcement officials found what they described as a "cover load" in the U-Haul—items placed in the vehicle to "fool law enforcement" into believing their story that they were in the process of moving from Washington to Maryland. There was a newly-purchased dresser and armoire with the tags still on them; several mattresses with no bed frames; newly-purchased pots and pans, still in the box; and a chair. There were also five boxes of vacuum-sealed packages of hydroponic marijuana, five containers of THC edibles; multiple cell phones; multiple iPads; a SIM card; two bags of leafy green plant material; luggage and duffel bags; a digital scale; and a package of rubber bands. The total weight of the marijuana was 297 pounds.

{¶ 13} Ortiz and Norales were both charged with possession of marijuana, a violation of R.C. 2925.11(A), a second-degree felony, and trafficking in marijuana, a violation of R.C. 2925.03(A)(2), also a second-degree felony. Their cases were eventually severed. The charges against Norales were tried to a jury on June 28 and 29, 2017, and he was found guilty of both counts. The trial court determined that the convictions merged for purposes of sentencing, and the state elected to proceed to

5.

sentencing as to the trafficking-in-marijuana conviction. The trial court sentenced Norales to a mandatory prison term of eight years.

{¶ 14} Norales appealed and assigns two errors for our review:

ASSIGNMENT OF ERROR I

APPELLANT WAS DENIED DUE PROCESS AND THE EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE STATE AND FEDERAL CONSTITUTIONS, AS APPELLANT'S COUNSEL MADE ERRORS SO DEFICIENT AS TO DEPRIVE APPELLANT OF A FAIR TRIAL.

ASSIGNMENT OF ERROR II

APPELLANT WAS DENIED DUE PROCESS AND THE EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE STATE AND FEDERAL CONSTITUTIONS AS A RESULT OF THE COMNBINED [sic] EFFECT OF THE INEFFECTIVE ASSISTANCE OF HIS TRIAL COUNSEL AND NUMEROUS INCIDENTS OF PROSECUTORIAL MISCONDUCT COMMITTED BY THE ASSISTANT PROSECUTOR.

## II. Law and Analysis

{¶ 15} In his first assignment of error, Norales contends that he was denied due process and effective assistance of counsel based on trial counsel's errors in failing to (1) file a motion to suppress statements that he made at the Highway Patrol Post;

(2) object to multiple instances of prosecutorial misconduct; (3) object to irrelevant, "highly prejudicial" evidence; (4) object to the admission of hearsay statements; (5) object to the court's jury instructions; and (6) appreciate that a mandatory eight-year prison term was at stake. He argues that even if one of these errors by itself did not constitute ineffective assistance of counsel, the combination of the errors did.

{¶ 16} In his second assignment of error, Norales contends that he was denied due process and a fair trial based on the combined effect of the ineffective assistance of trial counsel and numerous incidents of misconduct by the assistant prosecutor. Resolution of the issues raised in Norales's second assignment of error are subsumed by those raised in his first assignment of error, therefore, we consider both assignments together.

### A. Failure to file a motion to suppress.

{¶ 17} After his arrest on December 9, 2016, Norales was taken to the Highway Patrol Post where he was questioned by Officer Steven Cousino, of the Sylvania Township Police Department, and Trooper Anthony Martin, of the Ohio State Highway Patrol, both of whom are assigned to the DEA task force in Toledo. Norales indicated that he speaks Spanish and does not speak English very well. Trooper Martin, therefore, advised Norales of his *Miranda* rights in Spanish. Officer Cousino asked questions of Norales in English, which Trooper Martin translated into Spanish. He translated Norales's responses in English for Officer Cousino. At trial, Trooper Martin was permitted to relay to the jury statements that Norales made during this questioning. Norales argues that trial counsel was ineffective because he failed to file a motion to

7.

suppress these statements. He claims that trial counsel should have challenged Trooper Martin's level of fluency in Spanish, and, therefore, the accuracy of the statements from Norales that he interpreted and testified about.

{¶ 18} Before Trooper Martin testified at trial, he was questioned about his Spanish-language skills. He explained that he took two years of Spanish in high school. When he was 19, he embarked on a mission trip to Ecuador where he was immersed in the language for two years. Before leaving for that trip, he received training in Spanish at his church's missionary training center for approximately two months. As part of his job as a trooper, he is called upon to conduct interviews in Spanish. When asked by the assistant prosecutor to rate his fluency in Spanish on a scale of one to ten, Trooper Martin rated himself a seven.

{¶ 19} The state asked the court to qualify Trooper Martin as an expert Spanish interpreter or translator. With no objection from Norales, the court qualified him. Norales contends that trial counsel should have moved to suppress the statements he made to Trooper Martin because, by his own admission, Trooper Martin's translations are "wrong 30% of the time." He queries "which 30% of the *Miranda* rights Martin translated to [him] incorrectly[;] * * * what 30% of [his] responses to the warnings were misunderstood/misinterpreted by Martin[; and] * * * which 30% of Martin's account of what [he] told him was incorrect."

{¶ 20} In order to prevail on a claim of ineffective assistance of counsel, an appellant must show that counsel's conduct so undermined the proper functioning of the

8.

adversarial process that the trial court cannot be relied on as having produced a just result. *State v. Shuttlesworth*, 104 Ohio App.3d 281, 287, 661 N.E.2d 817 (7th Dist.1995). To establish ineffective assistance of counsel, an appellant must show "(1) deficient performance of counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 204, citing *Strickland v. Washington*, 466 U.S. 668, 687-88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *State v. Sanders*, 94 Ohio St.3d 150, 151, 761 N.E.2d 18 (2002).

{¶ 21} Counsel is not ineffective per se for failing to file a motion to suppress. *State v. Reynolds*, 2017-Ohio-1478, 89 N.E.3d 235, ¶ 61 (6th Dist.). The defendant must show that (1) there was a valid ground to suppress the disputed evidence, (2) there was a reasonable probability of success on the motion; and (3) there was a reasonable probability that suppression of the evidence would have changed the outcome of the trial. *State v. Clark*, 6th Dist. Williams No. WM-09-009, 2010-Ohio-2383, ¶ 21; *State v. Thompson*, 6th Dist. Lucas No. L-11-1184, 2013-Ohio-1597, ¶ 8. A claim of ineffective assistance will be rejected when counsel's failure to file a suppression motion "was a tactical decision, there was no reasonable probability of success, or there was no prejudice," or where counsel could have reasonably decided that filing a motion to suppress would be futile, even if there is evidence in the record to support such a motion.

9.

*State v. White*, 4th Dist. Washington Nos. 17CA10, 17CA11, 2018-Ohio-18, ¶ 39, citing *State v. Nields*, 93 Ohio St.3d 6, 34, 752 N.E.2d 859 (2001); *State v. Conkright*, 6th Dist. Lucas No. L-06-1107, 2007-Ohio-5315, ¶ 50.

{¶ 22} Norales relies on *State v. Ramirez*, 135 Ohio App.3d 89, 94, 732 N.E.2d 1065 (11th Dist.1999), in support of his position that trial counsel should have challenged Trooper Martin's qualifications and sought to suppress the statements he elicited. In *Ramirez,* the defendant moved to suppress statements he made to police because his *Miranda* rights were poorly translated by the interpreter provided by the police. For example, it was determined that (1) instead of using the Spanish term for "legal rights," the translator repeatedly used a term that means "right hand side;" (2) instead of using the phrase "under the law," she used the word "underneath," thus her translation referenced "something to do with a right hand side that was physically underneath the law;" (3) she told the defendant that he was entitled to "notifications" of counsel and not that he had the right to have an attorney present during questioning; (4) she failed to tell defendant that if he elected to speak, his statements could be used against him in a court of law and that he had the right to an attorney free of charge if he could not afford one; and (5) in attempting to determine if the defendant was willing to waive counsel, it sounded more like she was asking him if he had an attorney. *Id.* The court held that the significant problems with the translation rendered the reading of his *Miranda* rights insufficient to adequately apprise appellant of his rights, therefore, the trial court erred in denying his motion to suppress. *Id.* at 96-97.

10.

**{¶ 23}** Here, there is no indication in the record that Norales did not understand his *Miranda* rights. Norales testified at trial. He never suggested that a language barrier rendered him and Trooper Martin incapable of understanding each other. Rather, to the extent that Norales disputed a few of the statements Trooper Martin attributed to him (including that Norales had never been to Maryland before and that he helped Ortiz load heavy items into the U-Haul[1]), Norales testified that Trooper Martin "maybe * * * didn't remember" or "didn't explain correctly" or that "[a] better explanation would have been better."

**{¶ 24}** In addition to this, Trooper Martin interviewed Norales twice—once on December 9, 2016, without counsel present, and once on January 5, 2017, with counsel present. On cross-examination at trial, defense counsel asked Trooper Martin to admit that Norales's story had stayed the same between his first and second interviews, except that Norales offered additional details at his second interview. Trooper Martin conceded that this was true. The fact that defense counsel sought to establish from Trooper Martin that Norales's version of events remained consistent between the first and second interviews suggests to us that any discrepancies between what Trooper Martin and Norales recalled at trial were not on account of a language barrier.

**{¶ 25}** Finally, defense counsel cross-examined Trooper Martin and questioned his Spanish fluency. Defense counsel highlighted the fact that (1) by his own admission,

---

[1] These statements were significant because law enforcement found a picture of Norales's Maryland driver's license on his phone, and Norales denied loading the boxes of marijuana into the U-Haul.

11.

Trooper Martin's Spanish is not perfect, and (2) certain details can sometimes get lost in translation. With this information, it was the role of the jury to weigh the evidence and to determine whether to accept Trooper Martin's translation of Norales's statements.

{¶ 26} Accordingly, we find that Norales has not shown that there was a valid ground to suppress his statements, that there was a probability of success had a motion been filed, or that the outcome of the trial would have been different. We find no ineffective assistance of counsel arising from trial counsel's failure to file a motion to suppress.

### B. Failure to object to instances of prosecutorial misconduct.

{¶ 27} Norales next argues that trial counsel was ineffective for failing to object to instances of prosecutorial misconduct. He points to numerous examples in the trial transcript where the assistant prosecutor asked leading and otherwise improper questions and trial counsel failed to object.

{¶ 28} In one of the instances identified by Norales, the assistant prosecutor asked Trooper Malone if she is "a forensic analyst with respect to fingerprints" or DNA. She responded that she is not. Ignoring her response, he went on to ask her whether she was "aware of how difficult it is to get a useable fingerprint off of a textured surface;" whether she was "aware that even if you can get a useable print off a textured surface, you cannot say when that fingerprint was placed on that surface;" and whether she was "aware that even if you do get a useable strand of DNA, you cannot say when or how that DNA got on the object." The effect of these questions was that the assistant prosecutor

12.

himself testified to information that the witness was unable—and unqualified—to provide.

{¶ 29} Similarly, the assistant prosecutor asked Trooper Martin whether he was aware that "the rental agreement [for the Hyundai] said that there was no mileage charges[.]" This information was significant because Norales told Trooper Martin that they had been towing the Hyundai to save on mileage charges. Trooper Martin responded: "I was not, not until right now I'm not aware of that." In asking this question of Trooper Martin, the assistant prosecutor bypassed the proper procedure for the admission of this evidence.

{¶ 30} And during Norales's testimony, the assistant prosecutor questioned him about a statement he made to Bain in the back of the patrol car, indicating that they were going to "the federal." Norales explained that in Honduras, his native country, they call jail "the federal." But the assistant prosecutor asked him: "Isn't it true that you used the word federal because $1.3 million worth of marijuana typically gets prosecuted by the feds?" Although on cross-examination, leading questions are proper, Norales argues that the question was designed to magnify the importance of the case to the jury and to show Norales's "guilty knowledge."

{¶ 31} Finally, the assistant prosecutor repeatedly asked Norales why he was searching for work across the country instead of in Washington. Norales responded that work was slow in Washington and that jobs decrease during the rainy season. The assistant prosecutor replied, "It's always rainy season in Washington. I've been there."

13.

**{¶ 32}** To establish prosecutorial misconduct, a defendant must show that the prosecutor's conduct was improper and prejudicially affected the defendant's substantial rights. *State v. Walker*, 1st Dist. Hamilton No. C-060910, 2007-Ohio-6337, ¶ 45. "[A] reversal for prosecutorial misconduct will not occur unless it is clear that the outcome of the trial would have been different but for the misconduct." *State v. Boles,* 190 Ohio App.3d 431, 2010-Ohio-5503, 942 N.E.2d 417, ¶ 50 (6th Dist.), citing *State v. Smith*, 14 Ohio St.3d 13, 15, 470 N.E.2d 883 (1984). "Important considerations are whether the misconduct was an isolated incident or a protracted series of improper arguments, whether the defendant objected, whether curative instructions were given, and whether the evidence of guilt was overwhelming." *State v. Oviedo*, 6th Dist. Lucas No. L-95-287, 1997 Ohio App. LEXIS 3607, *4 (Aug. 15, 1997), citing *State v. Keenan*, 66 Ohio St.3d 402, 410, 613 N.E.2d 203 (1993).

**{¶ 33}** "A leading question is one that suggests to the witness the answer desired by the examiner." (Citations and quotations omitted.) *State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 166. Generally, this type of question should not be used on direct examination except to develop the witness's testimony. Evid.R. 611(C). "[A] prosecutor commits prosecutorial misconduct when leading questions pervade the entire trial in the face of a sustained objection." *State v. Lee*, 1st Dist. Hamilton No. C-160294, 2017-Ohio-7377, ¶ 20; *see also State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 265, citing *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 170 ("[P]rosecutorial misconduct can

14.

occur when a prosecutor continues to ask leading questions even after the trial court has sustained objections on that basis.").

{¶ 34} Certainly there were several times that the assistant prosecutor asked leading or otherwise improper questions, and trial counsel failed to object. But upon our review of the record in its entirety, we would not characterize these improper questions as "pervasive." We also cannot say that trial counsel was ineffective for failing to object to them because, as this court has recognized, a failure to object is generally viewed as trial strategy and alone will not establish an ineffective assistance claim. *State v. Rossbach*, 6th Dist. Lucas No. L-09-1300, 2011-Ohio-281, ¶ 135. *See also State v. Franklin*, 97 Ohio St.3d 1, 2002-Ohio-5304, 776 N.E.2d 26, ¶ 42 ("A reasonable attorney may decide not to interrupt his adversary's argument as a matter of strategy.").

{¶ 35} We find no ineffective assistance of counsel arising from trial counsel's failure to object to the assistant prosecutor's leading or otherwise improper questions. We also find that the questions were not so pervasive as to constitute reversible prosecutorial misconduct.

### C. Failure to object to irrelevant, prejudicial evidence.

{¶ 36} Norales also argues that trial counsel was ineffective for failing to object to evidence that he claims was both irrelevant and highly prejudicial. Specifically, the assistant prosecutor asked Norales whether he knew how hundreds of pornographic pictures of women got on his phone. When Norales said that he did not know, the

assistant prosecutor continued by inquiring: "Were you aware it's nearly 17,000 pictures? Christian?" Trial counsel failed to object.

{¶ 37} In his closing argument, the assistant prosecutor persisted with this theme:

Now, this good Christian man would have you believe that he was the unluckiest man in the world * * *.

I'm going to encourage you to ask the Court for a computer, to plug this in, to open it up and peruse it, and to look at what was in the contents of this good Christian's cell phone, a cell phone that he claimed to have had for two or three years but occasionally loaned to Mr. Ortiz. Nearly 17,000 pornographic videos and pictures, not of his wife.

Again, trial counsel failed to object.

{¶ 38} That pornographic images were found on Norales's phone was not relevant to any issue in this case. We agree with Norales that there was no legitimate reason for raising this issue at trial—either on cross-examination or in closing—and that the assistant prosecutor acted improperly by doing so. *State v. Dillon*, 2016-Ohio-1561, 63 N.E.3d 712, ¶ 36 (2d Dist.) (finding that admission of white-supremacist screen names and pornographic nature of web sites accessed by appellant were not relevant to any material issue in the case and were unfairly prejudicial); *State v. Mills*, 2d Dist. Montgomery No. 8925, 1985 Ohio App. LEXIS 6883, *10 (July 17, 1985) (finding that possession of pornographic materials was irrelevant to issue of knowing possession of illicit drugs).

16.

**{¶ 39}** We also agree with Norales that the assistant prosecutor acted improperly when he asked Norales if he was Christian and then mocked him during closing argument, sarcastically referring to him as "this good Christian." *See State v. Rahman*, 23 Ohio St.3d 146, 153, 492 N.E.2d 401 (1986) ("[A]ppeals to racial or religious prejudices are improper conduct on the part of a prosecutor and may exert such a substantial influence on the result at trial that reversal is required."); *State v. Gilbert*, 12th Dist. Butler No. CA2010-09-240, 2011-Ohio-4340, ¶ 58.

**{¶ 40}** But while the assistant prosecutor acted improperly in asking about the pornographic images and referencing them during closing—and in mocking Norales's Christianity—we cannot say that trial counsel was ineffective for failing to object. First, an objection from trial counsel may have served only to highlight the improper evidence. *State v. Lawless*, 9th Dist. Wayne No. 16AP0025, 2018-Ohio-444, ¶ 20 ("[T]rial counsel may have made the strategic decision not to object because doing so would 'only serve to highlight negative testimony.'"). Additionally, Norales has not shown that the outcome of the trial would have been different had an objection been registered.

**{¶ 41}** And while we recognize that the assistant prosecutor acted improperly, we cannot say that his conduct amounted to misconduct requiring reversal because, again, Norales has not shown that the outcome of the trial would have been different absent the improper conduct. *See Boles,* 190 Ohio App.3d 431, 2010-Ohio-5503, 942 N.E.2d 417, at ¶ 50, citing *Smith*, 14 Ohio St.3d at 15, 470 N.E.2d 883 ("[A] reversal for prosecutorial

17.

misconduct will not occur unless it is clear that the outcome of the trial would have been different but for the misconduct.").

{¶ 42} We find no ineffective assistance of counsel arising from trial counsel's failure to object to the assistant prosecutor's mocking references to Norales's Christianity and to references to the pornographic images found on his phone. We also find no reversible prosecutorial misconduct.

### D. Denigrating defense counsel.

{¶ 43} Following defense counsel's closing argument, the assistant prosecutor in his rebuttal argument began by stating "[w]ell, that was entertaining." Multiple times, he called defense counsel's summary of the evidence misleading, and he referred to defense counsel's argument as "a simple defense trick that they like to do to jurors to try and mislead you." Norales argues that trial counsel was ineffective for failing to object to these improper statements.

{¶ 44} "Generally, prosecutors are entitled to considerable latitude in opening and closing arguments*." Boles*, 6th Dist. Lucas No. L-07-1255, 2009-Ohio-512, at ¶ 47, citing *State v. Ballew,* 76 Ohio St.3d 244, 667 N.E.2d 369 (1996). During closing, a prosecutor may comment on what the evidence has shown and what reasonable inferences may be drawn from the evidence. *Id.* He or she may not, however, denigrate or impute insincerity to defense counsel in the jury's presence. *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 301, citing *State v. LaMar,* 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 167. Having said this, isolated incidents of

18.

prosecutorial misconduct are considered harmless, and the closing argument must be viewed in its entirety to determine whether the defendant was prejudiced. *Id.,* citing *State v. Stevens,* 2d Dist. Montgomery No. 19572, 2003-Ohio-6249.

{¶ 45} Having reviewed the closing arguments in their entirety, we find that the assistant prosecutor's comments were not so pervasive as to cause prejudice to Norales. We also find that trial counsel was not ineffective for failing to object to the assistant prosecutor's improper comments.

### E. Failure to object to jury instructions regarding expert testimony.

{¶ 46} As previously discussed, Trooper Martin provided Spanish-to-English and English-to-Spanish translations during interviews of Norales. He was permitted to testify at trial concerning statements that Norales made during those interviews.

{¶ 47} Additionally, Trooper Malone's cruiser was wired to record both video and audio of the back seat of the vehicle, and to record video of what was happening in front of the cruiser. U.S. Border Patrol Agent, Alexander Chavez, watched and listened to the recordings of the conversations between Bain, Ortiz, and Norales while they were seated in the back of Trooper Malone's squad car. Agent Chavez, like Norales, grew up in Honduras. Some of the audio was inaudible or unintelligible, but Agent Chavez transcribed what he was able to hear. He also watched the video recording of what was happening in front of the cruiser. This allowed him to determine when the suspects' conversations or statements were made in relation to what they were seeing outside the

19.

cruiser. He testified at trial concerning his translation and observations, and the transcript he created was admitted into evidence.

{¶ 48} The state asked the court to qualify Trooper Martin and Agent Chavez as experts in the translation of Spanish-to-English and English-to-Spanish. The trial court qualified both of them as experts. As to Agent Chavez, it did so over the objection of the defense; trial counsel did not raise an objection as to Trooper Martin testifying as an expert.

{¶ 49} In addition to these two witnesses, two interpreters were appointed to translate the proceedings due to Norales's lack of proficiency in English. Those two interpreters took an oath to follow the guidelines for legal interpreting. Trooper Martin and Agent Chavez were also asked to take interpreters' oaths after being qualified as expert witnesses.

{¶ 50} At the close of evidence, the trial court included an instruction to the jury with respect to the participation of the interpreters:

> During this trial the interpreters or translators have provided interpretations or translations. The interpreter/translators must provide a complete and accurate interpretation or translation without altering, omitting, or adding anything to what has been spoken or written and without explaining the statements of the original speaker or writer.
>
> You are not permitted to make any assumptions about any witness or party based upon the use of an interpreter/translator. Do not allow the fact

that the testimony was in a language other than English influence you in any way.

The evidence you are to consider is only that provided through the interpreters/translators. Although some of you may understand Spanish, you must disregard your own interpretation or translation because you are not permitted to disagree with the English translations that have been provided to you. All jurors must consider the same evidence.

Because you have received multiple interpretations or translations that disagree, it is your duty to decide which, if any, interpretation or translation is accurate.

The court did not, however, provide an instruction with respect to the consideration of expert testimony.

{¶ 51} Norales argues that trial counsel was ineffective for failing to object to the jury instructions. He claims that the instruction with respect to interpreters coupled with the absence of an instruction on expert testimony caused jurors to feel constrained to accept as true Trooper Martin and Agent Chavez's testimony, especially given that they were recognized as experts in Spanish. He maintains that his guilt or innocence turned on his credibility and professed lack of knowledge about the marijuana in the U-Haul, and he insists that the state's "expert" interpreters were permitted to editorialize when they testified about statements made by Norales during his interview and while in the back of Trooper Malone's squad car.

21.

**{¶ 52}** The trial court's instruction here is a recitation of Ohio Jury Instructions section 401.29. That instruction was appropriately given. But because Trooper Martin and Agent Chavez were qualified as Spanish-to-English translation experts, an instruction on expert-witness testimony was also warranted in this case. Interestingly, some jurisdictions—including the Seventh Circuit, the Eighth Circuit, and Florida—have adopted a pattern jury instruction for situations such as this. It provides:

> Among the exhibits admitted during the trial were recordings that contained conversations in the _____ language. You were also provided with English transcripts of those conversations. The transcripts were provided to you [by the government] so that you could consider the content of the conversations on the recordings.

> Whether a transcript is an accurate translation, in whole or in part, is for you to decide. In considering whether a transcript accurately describes the meaning of a conversation, you should consider the testimony presented to you regarding how, and by whom, the transcript was made. You may consider the knowledge, training, and experience of the translator, as well as the nature of the conversation and the reasonableness of the translation in light of all the evidence in the case. You should not rely in any way on any knowledge you may have of the language spoken on the recording; your consideration of the transcripts should be based on the evidence introduced in the trial.

22.

*United States v. Solis Jordan*, 223 F.3d 676, 689 (7th Cir.2000), fn. 10, quoting Seventh Circuit Federal Criminal Jury Instructions, § 3.18. *See also United States v. Gutierrez*, 367 F.3d 733, 736 (8th Cir.2004) ("When dealing with English transcripts of recorded conversations that were originally spoken in a foreign language, district courts are encouraged to use an instruction similar to the Seventh Circuit's Federal Criminal Jury Instruction § 3.18."); Florida Standard Jury Instruction (Criminal) 2.11.

{¶ 53} The jury instructions issued by the court would have been much clearer if they included an instruction similar to the Seventh Circuit's pattern jury instruction. Nevertheless, we find that Norales has failed to establish a claim for ineffective assistance of counsel because he has not demonstrated that he suffered prejudice from counsel's failure to object to the instructions.[2]

{¶ 54} When considering a challenge to the accuracy or completeness of the court's charge to the jury, the jury instructions must be read as a whole. *State v. Price*, 60 Ohio St.2d 136, 141, 398 N.E.2d 772 (1979). While the instructions here do not include a specific provision explicitly allowing jurors to reject Trooper Martin and Agent Chavez's translations, they do include a provision indicating that multiple translations were provided and that it was the jury's duty to decide "which, if any, interpretation or translation is accurate."

---

[2] We also note that the record contains no transcript of the charge conference, therefore, it is not clear whether trial counsel registered any objections to the jury instructions.

23.

{¶ 55} Norales did not challenge the accuracy of Trooper Martin's translations. He did, however, challenge a couple of Agent Chavez's translations. Norales testified on direct about purported errors in Agent Chavez's translations and was also cross-examined about them. Given that the trial court instructed the jury to decide *which, if any* interpretation or translation was accurate, the instructions—when read as a whole—gave the jury the option to reject Agent Chavez's interpretations or to choose Norales's interpretations over Agent Chavez's.

{¶ 56} Accordingly, we find that trial counsel was not ineffective for failing to object to the trial court's instructions to the jury.

## F.  Failure to object to hearsay statements.

{¶ 57} Norales argues that trial counsel was ineffective for failing to object to hearsay statements offered through the testimony of Trooper Malone. Trooper Malone testified that Bain said that Norales—not Ortiz—was moving to Maryland, and that Ortiz stated that the items in the U-Haul belonged to Norales. He claims that in the absence of an objection from trial counsel, the admission of these hearsay statements undermined his credibility. However, a recording of the traffic stop was admitted into evidence as an exhibit, and in that video, Bain and Ortiz themselves make these statements. An objection from trial counsel would not have prevented the damage that allegedly resulted to Norales's credibility.

{¶ 58} We find no ineffective assistance of counsel arising from trial counsel's failure to object to the admission of hearsay statements.

24.

### G. Failure to appreciate that a mandatory eight-year prison term was at stake.

{¶ 59} Norales argues that trial counsel was ineffective because he failed to appreciate that if convicted, Norales faced a mandatory eight-year term of incarceration. While it is true that at sentencing, trial counsel indicated that he believed that there was merely a "presumption" of eight years' incarceration, it was mentioned at the hearing of April 17, 2017, that the charges carried a mandatory eight-year prison term. The statement was made in reference to Ortiz's decision to reject a plea agreement, however, Norales's trial counsel was present and participated at that hearing. And more importantly, Norales fails to articulate how this alleged misunderstanding affected the outcome of the trial.

{¶ 60} We find no ineffective assistance of counsel arising from trial counsel's purported failure to appreciate the gravity of the potential sentence that Norales was facing.

### H. Cumulative Error

{¶ 61} Finally, Norales argues that the cumulative effect of his trial counsel's ineffectiveness and the assistant prosecutor's misconduct deprived him of his right to a fair trial. "The cumulative-error doctrine provides that 'a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial-court error does not individually constitute cause for reversal.'" *State v. Belton*, 149 Ohio St.3d 165, 2016-Ohio-1581, 74 N.E.3d

25.

319, ¶ 152, citing *State v. Powell*, 132 Ohio St.3d 233. 2012-Ohio-2577, 971 N.E.2d 865, ¶ 223.

{¶ 62} Here, we have not found counsel to have been ineffective. And while we have found that several of the assistant prosecutor's questions and comments were improper, reviewing the proceedings as a whole, we cannot say that Norales was deprived of a fair trial.

{¶ 63} In sum, we cannot say that counsel was ineffective for (1) failing to file a motion to suppress Norales's statements, (2) failing to object to multiple instances of prosecutorial misconduct, the admission of hearsay statements, the admission of irrelevant, "highly prejudicial" evidence, or the jury instructions; or (3) failing to appreciate that a mandatory eight-year prison term was at stake. And while we acknowledge that the assistant prosecutor asked several improper questions and made improper denigrating comments about defense counsel during closing argument, Norales has not shown that the conduct was sufficiently pervasive or prejudicial to have deprived Norales of a fair trial.

{¶ 64} Accordingly, we find Norales's two assignments of error not well-taken.

### III. Conclusion

{¶ 65} Trial counsel was not ineffective for failing to file a motion to suppress Norales's statements to Trooper Morales. Norales testified that discrepancies in the testimony were on account of the trooper's failure to recall or failure to effectively explain what Norales told him—not due to a language barrier. Accordingly, Norales

26.

failed to show that there was a valid ground to suppress his statements, that there was a probability of success had a motion been filed, or that the outcome of the trial would have been different.

{¶ 66} Trial counsel was not ineffective for failing to object to the assistant prosecutor's leading or otherwise improper questions. Moreover, the assistant prosecutor's improper questions were not so pervasive as to constitute reversible prosecutorial misconduct.

{¶ 67} While evidence that pornography was found on Norales's phone was irrelevant, and while the assistant prosecutor improperly mocked Norales as a "good Christian," counsel was not ineffective for failing to object. These instances did not rise to the level of reversible prosecutorial misconduct.

{¶ 68} When read in its entirety, the assistant prosecutor's denigrating statements about defense counsel were not so pervasive as to cause prejudice to Norales. Trial counsel also was not ineffective for failing to object to the improper comments.

{¶ 69} Trial counsel was not ineffective in failing to object to hearsay statements admitted through Trooper Malone, especially given that the statements to which she testified were recorded and the recording was admitted as an exhibit at trial.

{¶ 70} When read as a whole, the jury instructions permitted the jury to reject the state's witnesses' translations. Trial counsel was not ineffective for failing to object to the instructions.

27.

**{¶ 71}** Norales failed to articulate how the outcome of the trial was affected by trial counsel's belief that an eight-year prison term was merely presumed—and was not mandatory.

**{¶ 72}** We find Norales's two assignments of error not well-taken and affirm the July 10, 2017 judgment of the Wood County Court of Common Pleas. Norales is ordered to pay the costs of this appeal under App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.          _____
                                              JUDGE
Thomas J. Osowik, J.          

Christine E. Mayle, P.J.          _____
CONCUR.                                       JUDGE

                                              _____
                                              JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.